OPINION

Petitioners seek a writ of prohibition preventing Respondent, the Kayenta District Court, from exercising jurisdiction over claims in negligence filed against Petitioners arising from a motor vehicle accident occurring within the Navajo Nation on U.S. Highway 160 west of the Township of Kayenta, Arizona. Petitioners are nonmembers of the Navajo Nation. Fatalities resulting from the accident were a Navajo man and unborn fetus. The Kayenta court has refused to dismiss the claims upon Petitioners’ motion, finding jurisdiction under Article II of the Navajo Treaty of 1868, the Reserved Rights Doctrine, and the settled federal policy for Indian self-determination. As this is a writ of prohibition, jurisdiction is properly in this court pursuant to N.R.C.A.P. Rule 26(a). We conclude that prohibition is not warranted in this case on the same and additional grounds, and therefore DENY the petition.
I
The relevant facts are as follows: on the morning of September 21, 2004, a tour bus owned by Conlon Garage of Fort Collins, Colorado collided head-on with a car conveying a Navajo family on U.S. Highway 160, on the western edge of the Navajo Nation Township of Kayenta, Arizona. The driver of the car, Butch Johnson, died in that accident as did the fetus of his pregnant wife, Jamien Rae Jensen, a passenger in that car. Their minor son, Da-kotah, was also injured. The tour bus was chartered by Express Charters or EXC, Inc., (EXC) a Nebraska corporation pursuant to a December 22, 2003 coach service agreement between EXC and Go Ahead Vacations, Inc. (Go Ahead), a Massachusetts corporation for purposes of the operation of tours in North America. Under this agreement, EXC provided a tour vehicle and qualified driver and Go Ahead organized tours and provided a tour director. Russell J. Conlon operated the bus as an employee of EXC. The above individual and entities are non-Navajos and non-residents of the Navajo Nation engaged in the tour business and are collectively Petitioners in this writ application.
On August 12, 2006, Real Parties in Interest (RPIs) Jamien Rae Jensen and other immediate family members of decedent Butch Johnson filed claims in negligence against Petitioners and Progressive Classic Insurance Company in the Kayen-ta District Court. On January 18, 2007, Petitioners filed a motion to dismiss, which the Kayenta District Court denied. On February 8, 2010, Petitioners filed a Petition for Writ of Prohibition to this Court. We ordered a stay on the proceedings, which was later partially lifted for purposes of settling claims on March 4, 2010 on the motion of eo-Defendants Progressive Classic Insurance Co. and the Estate *179 of Butch Corey Johnson, neither of whom are parties to the petition for writ.
The Kayenta District Court (Respondent) and RPIs filed responses, to which Petitioners timely replied. On March 17, 2010 this Court issued an Order Requesting Amicus Briefs. Amicus Curiae Mountain States Legal Foundation filed a brief in support of the petition for writ on April 28,1010. The Court held oral argument at the Marion Rice Kirkwood Moot Courtroom at Stanford Law School on April 30, 2010.
II
The issue before us is whether the Navajo Nation has jurisdiction over Petitioners personally and over the subject matter of this negligence claim.
The Kayenta District Court found jurisdiction under the Treaty of 1868, the Reserved Rights Doctrine, and the settled federal policy for Indian self-determination. We note that jurisdiction over non-members is further provided by Navajo Nation statutes, namely, the 2001 Navajo Nation Long Arm Civil Jurisdiction and Service of Process Act (Long-Arm Statute) at 2 N.N.C. § 253a and the Navajo Nation Tour and Guide Services Act (NNTGSA) at 5 N.N.C. § 2501 et seq. We review legal conclusions de novo. Navajo Transport Services v. Schroeder, No. SC-CV-44-06, 7 Am. Tribal Law 516, 519 (Navajo April 30, 2007) citing Navajo Nation v. Kelly, 6 Am. Tribal Law 772, 775 (Navajo 2006). Jurisdictional matters may be raised at any time and the Court itself may present the issue. See Ford Motor Company v. Kayenta District Court, and concerning Todacheene, 7 Am. Tribal Law 652, 657-58 (Navajo 2008) (cites omitted).
III
There is no simple test for determining jurisdiction of Indian Nations over nonmembers. See Philip Morris USA, Inc. v. King Mountain Tobacco Company, Inc., et al, 569 F.3d 932 (9th Cir.2009) citing Stock West, Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221, 1228 (9th Cir.1989) (stating “there is no simple test for determining whether tribal jurisdiction exists”). Under propositions of the United States Supreme Court suggested since the late 1970s, questions of the jurisdiction of Indian Nations over non-members have become a “complex patchwork of federal, state, and tribal law.” Duro v. Reina, 495 U.S. 676, 680 n. 1, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). For the Navajo Nation, jurisdiction over reservation matters is well-settled both as an inherent right and as conferred under Article II of the Treaty of 1868 (Navajo Treaty).
The precedents of this Court have emphasized the Navajo Treaty as the primary source of the Nation’s authority. See Dale Nicholson Trust v. Chavez, 8 Nav. R. 417, 428, 5 Am. Tribal Law 365 (Navajo 2004); Ford, supra at 656-57. We have held that Article II of the Navajo Treaty specifically recognizes the Navajo Nation’s authority to regulate all non-members, including non-Indians, other than certain federal employees on its lands. Dale Nicholson, supra. We have rightly expected the Navajo Treaty, like all treaties with the United States, to be treated as the “supreme Law of the Land,” binding every state under Article VI of the U.S. Constitution. The Navajo Treaty has not been changed or rescinded and holds force today.
Our ancestors understood that authority over all non-criminal reservation matters that concern Navajos were reserved to the Navajo people. Under a longstanding rule of construction, Indian treaties are to be construed as they were understood by the tribal representatives *180 who participated in their negotiation. See, e.g., Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The rule applies today, memorialized in our own precedents which require us to interpret the Navajo Treaty as our ancestors understood it. Dale Nicholson Trust, supra at 428, 5 Am. Tribal Law 365 citing Means v. District Court of the Chinle Judicial District, 7 Nav. R. 383, 389, 2 Am. Tribal Law 439 (Nav.Sup.Ct.1999). Treaty terms are to be liberally interpreted to accomplish their protective purposes, with ambiguities to be resolved in favor of the Indians due to the disadvantaged position of tribes and their terms often explained inexactly or incorrectly to the Indian signatories. Long held by the U.S. Supreme Court, this rule has carried over from treaties to statutes dealing with Indian matters, see, e.g., Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918) (re-stating “the general rule that statutes passed for the benefit of the dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians.”). The Treaty of 1868 remains our primary basis for civil jurisdiction over all reservation matters.
In 2001, the Navajo Nation Council codified its jurisdictional reach through the 2001 Navajo Nation Long-Arm Statute which provides, in relevant part:
C. ... A Court of the Navajo Nation may exercise personal and subject matter jurisdiction over any non-member who consents to jurisdiction by commercial dealings, residence, employment, written or implied consent, or any action or inaction which causes injury which affects the health, welfare, or safety of the Navajo Nation or any of its members located within the territorial jurisdiction of the Navajo Nation, or any other act which constitutes the assumption of tribal relations and the resulting express or implied consent to jurisdiction. A Court of the Navajo Nation may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action for relief arising from the person’s:
1. Transacting any business in the Navajo Nation; ...
3. Causing tortious injury by any act or omission within the Navajo Nation;
7 N.N.C. § 253a(C).
This Court has held that the Long-Arm Statute does not so much establish Navajo civil jurisdiction over reservation affairs as codify the authority of the Navajo Nation as affirmed in Article II of the Treaty of 1868 (Navajo Treaty). As such, the Act clarifies the modem application of this authority. Ford, supra at 659-60, n. 5. This Court will consider whether Petitioners’ conduct or activities fall within the language of the Navajo Nation Long-Arm Statute.
IV
Arguments pro and against jurisdiction turn on whether Petitioners were conducting tour business activities on the Navajo Nation when events giving rise to this suit arose. This Opinion will, by necessity, contain some lengthy discussion on the nature of Petitioners’ activities within the Navajo Nation.
Petitioners argue that their activities on the Navajo Nation were neither tour business services nor commercial dealings under the Long-Arm Statute because they were only passing through the Navajo Nation while making an incidental “side trip” to Monument Valley Tribal Park, a Navajo *181 Nation-run tourist attraction, and staying overnight at a Navajo Nation hotel. RPIs argue that the visit to Monument Valley was no side trip and was, in fact, regularly taken on each of Petitioners’ U.S. National Parks package tours which was offered twelve times in the 2004 season, therefore Petitioners knew or should have known that their activities were subject to Navajo Nation regulation and adjudication.
In 2004, over 2.5 million tourists visited scenic sites within the Navajo Nation,[1]
As a matter of economics, culture and public welfare, the Navajo Nation must regulate the millions of visitors traveling to and from sites in its territory, over 27,000 square miles of which are policed by no more than 350 Navajo police officers enforcing tribal laws. Tour businesses are responsible not only for their passengers, but for the safety of other vehicles on our roadways and the safe and respectful interaction between cultures on Navajo sites.
The U.S. Supreme Court has repeatedly suggested that the jurisdictional reach of tribal courts is identical to the scope of the tribe’s legitimate regulatory interests.[2] The Navajo Nation regulates the tour industry within the Navajo Nation via the Navajo Nation Tom* and Guide Services Act (NNTGSA) at 5 N.N.C. § 2501 et seq. Under the NNTGSA, tour businesses must “abide by any and all regulations adopted, published and enforced pursuant to the [NNTGSA],” 5 N.N.C. § 2501(D) which includes obtaining a Navajo Nation permit and signing an agreement consenting to the jurisdiction of the Navajo Nation Courts. 5 N.N.C. § 2501(A) and NNTGSA Regulations, Section 1(G)(3). Tour business activities include “touring, visiting, sightseeing or like activities within the Navajo Nation ... for hire.” 5 N.N.C. § 2501(A). Due to their size, concerns with vehicle maintenance and driver fatigue, inattention, and speeding, and the narrowness, curves, and often rolling nature of Navajo Nation roads, tour buses are a potential public safety menace. Their conduct and the need to regulate that conduct have a direct impact on Navajo Nation interests.
The following facts are undisputed: When the collision occurred on September 21, 2004, Petitioners were transporting a tour group across the Navajo Nation after having stopped at Monument Valley Navajo Tribal Park the day before. The trip was part of Petitioners’ 2004 U.S. National Parks Package Tour. The tour route traversed almost 200 miles of contiguous Navajo Nation territory from its northeastern to western external borders. There was a scheduled overnight stop at a hotel midway across the Navajo Nation at the township of Kayenta on U.S. Highway 160. While the stop at Monument Valley Tribal Park (the Park), was not reflected in the written itinerary, the stop was regularly taken on each trip “time and mileage allowing.” Affidavit of Russell J. Conlon, Petition, Exhibit J. On the trip in question, the group’s tour director directed the bus driver to take the 5-mile loop road into the Park, and the tour director also paid the group’s park entrance fee. The group stayed in the Visitor Center for more than one hour, arriving at the Park at 3 p.m. later arriving at their hotel 24 miles away at 5 p.m. Petitioners did not have a Navajo Nation tour permit and did *182 not sign the requisite consent agreements under the NNTGSA.
Petitioners argue that the stop at the Park was merely for services, like a stop at a store or restrooms. Essentially, Petitioners are arguing Montana’s proposition that the mere receipt of tribal services does not create the requisite nexus between a tribe and a nonmember to support an exception to Montana’s general restrictions. Montana, supra at 565, 101 S.Ct. 1245. We cannot agree with Petitioner’s argument, Tse’Bii’Ndzisgaii, Monument Valley Tribal Park is the premier Navajo Nation tourist attraction. Located at the end of a 5-mile long loop road, it is not a convenience stop and furthermore, requires payment of a park entrance fee. The Visitor Center contains a museum, souvenir gift shop and outdoor viewing terrace, all of which may be leisurely visited during the length of stop taken by the group. The museum presents both the film history and cultural history of the Park, and the large souvenir gift shop offers a wide range of tourist souvenirs. From the terrace, footpaths and trails lead into the Park.
Petitioners argue that the stop was incidental, a “side trip.” The facts say otherwise. The Monument Valley stop was regularly taken throughout the 2004 season at the request of the tour director. We further note that the only other scenic stop for the tour on the day of a Monument Valley stop is a morning visit to Mesa Verde Park. The tour schedule puts the group in Monument Valley in the mid-afternoon. Monument Valley is open as late as 8:00 p.m. in the tour season.[3] The 5-mile loop road is, furthermore, a less than 10 minute journey off the highway. Neither time nor mileage are serious factors in the tour schedule and the route taken by the tour bus.
Petitioners argue that the tour group enjoyed Monument Valley on their own without tour guidance from Petitioners, and the tour bus did not enter the Park. Petitioners’ arguments are misleading. We take judicial notice that tour buses are not permitted on the Park’s dirt trails. Tour companies are also not permitted to serve as tour guides in the Park. Private vehicles are permitted, as are visitors on foot who can climb easily down to the Park from the outdoor viewing terrace at the Visitor Center. Tour guidance, if needed, is provided by local Navajo guides. We further take judicial notice that the viewing terrace is itself a tourist destination. The Park’s scenery as viewed from the terrace is a major draw for visitors, with majestic and massive sandstone buttes rising from the valley floor very close to the Visitor Center. The buttes are featured in classic John Ford westerns such as Stagecoach and The Searchers, starring John Wayne, recent movies such as Forrest Gump and Wind,talkers, and even recruitment commercials for the U.S. Marine Corp. The Monument Valley buttes are considered “the most enduring and definitive images of the American West.”[4] The Park view is “spectacular”[5] and considered “one of the most majestic—and most photographed—points on earth.”[6]
*183 While the stop at the Park alone would itself count as a tour activity under the NNTGSA, the tour bus took a route across almost 200 miles of pristine and scenic Navajo canyon lands and high desert, which together with Navajo communities en route, are of sightseeing interest. Petitioners brought tour groups through the Navajo Nation on a route through the scenic Valley of the Gods to Monument Valley. The Navajo Nation leg of the tour was substantial, consisting of large portions of 2 days and an overnight stay at a Navajo Nation hotel.
Tourism is travel for leisure purposes, and Petitioners are engaged in the tour business jointly by contract. The business involves transporting tourists to sites of interest, who may then purchase souvenirs, take pictures, experience scenery, culture and people. These purposes were part of the Monument Valley visit and also Petitioners’ overall Navajo Nation tour. Petitioners’ arguments are a transparent attempt to trivialize their substantial tour activities within the Navajo Nation in order to evade Navajo Nation jurisdiction.
Tour companies’ evasion of Navajo Nation regulation is a serious ongoing problem. Due to a shortage of enforcement resources, the Navajo Nation relies in good faith that tour businesses will declare themselves, take out the requisite permits, and sign the required agreements to abide by our laws and operate tour services and conduct tours in an orderly, professional and ethical manner. Tour business are further obliged to obtain and maintain liability insurance; comply fully also with state and federal laws; not offer, consume or allow the possession of alcohol; provide monthly written reports; ensure vehicles are in good mechanical condition, safety equipment is provided, and passenger máximums not exceeded; ensure proper licensing, including first-aid certification; comply fully with park regulations; and conduct tours in a manner that does not bring discredit or disparagement to the Navajo Nation. RPI’s Response, Exhibit Up (NNTGSA Regulations) and Exhibit 15 (Tour Passenger Service Agreement, Vehicle Tours).
We find that when the collision occurred and also regularly in the 2004 tourist season, Petitioners’ activities within the Navajo Nation constituted tour business activities within the meaning and purpose of the NNTGSA, and were also “commercial dealings” under the Long-Arm Statute.
V
We next examine whether Petitioners’ dealings are sufficient to provide Petitioners notice that their activities may lead to suits on the Navajo Nation, thereby supporting Navajo Nation personal and subject matter jurisdiction over Petitioners. For civil jurisdiction to be found, the exercise of jurisdiction must not violate notions of due process. The Navajo Nation must provide due process through fundamental fairness and the value of k’k Fort Defiance Housing Corp. v. Allen, 8 Nav. R. 492, 500, n. 4, 5 Am. Tribal Law 408 (Nav.Sup.Ct.2004) citing Fort Defiance Housing Corp. v. Lowe, 8 Nav. R. 463, 475, 5 Am. Tribal Law 394 (Nav.Sup. Ct.2004). Fundamental fairness requires that we weigh the facts of each case rather than mechanically apply a formulaic test. Where the Long-Arm Statute is applied to assert jurisdiction over non-Indians, we will ground our analysis in both our laws and the laws of the United States applied in “fairness and mutual respect,” which is due process in the Navajo Nation context. See, e.g., In re Est. of Goldtooth Begay # 2, 1 Nav. R. 29, 31 (Nav.Sup.Ct.1992).
We find that Petitioners had a direct business presence in the Navajo Nation. The core business of Petitioners is a *184 vehicle tour service operated without a Navajo Nation permit. Petitioners do not dispute the authority of the Navajo Nation to regulate the tour industry within its territory, only that their activities on the Navajo Nation do not rise to the level of tour activities. Neither do Petitioners claim that they did not know a permit is required carrying with it an obligation to abide by Navajo Nation laws and consent to the jurisdiction of our courts. Permit or none, Petitioners knew or should have known that their activities would subject them to Navajo Nation jurisdiction over their tour-related activities.
Petitioners argue that the NNTGSA does not specifically provide for Navajo Nation court jurisdiction over claims of tortious conduct. As jurisdiction is amply provided for under the Long-Arm Statute, we need not address this issue.
Petitioners claim that by not acquiring the necessary vehicle tour permit from the Navajo Nation Parks and Recreation Department and signing the requisite agreement, they effectively withheld their consent to Navajo Nation court jurisdiction sufficient to evade jurisdiction. Petitioners’ have not claimed that the Navajo Nation’s consent-to-jurisdietion clause is either unreasonable or unjust. The clause is clear and unambiguous. In addition, we have found the requisite nexus between Petitioners and this forum. As a matter of public welfare and Navajo Nation governance, this Court cannot agree with Petitioner that the absence of a signed consent allows a tour business to evade Navajo Nation regulatory and adjudicatory authority.
There is no doubt that Petitioners regularly took advantage of a Navajo Nation scenic site for business purposes while leaving it off the itinerary and failing to obtain necessary permits. This Court is unable to find any authorities that support Petitioners’ theory that consent to jurisdiction can be withheld by a violation of a forum’s laws. In this Court’s view, Petitioners submitted to the personal jurisdiction of the Navajo Nation under the Long-Arm Statute through the provision of their tour services which further satisfies “implied consent” under the language of the Long-Arm Statute for due process reasons.
Petitioners argue that the only remedy for not obtaining a tour permit is a civil fine, which action must be initiated by the Navajo Nation Parks and Recreation Department. They argue that since a finding of jurisdiction is not included as a remedy, jurisdiction may not be found. Petitioners misstate the issue before this Court and the nature of permit remedies. Our purpose is to resolve tribal court jurisdiction pursuant to the entirety of Navajo Nation law. We note that governmental statutes that set forth business licensing or permit requirements and penalties rarely, if ever, require an agreement to be signed evidencing consent to abide by the laws of that government. Such consent is presumed by the business activity. By its plain language, the NNTGSA requires tour businesses to “abide by any and all regulations adopted, published and enforced pursuant to the [NNTGSA],” whether or not an express consent is given. 5 N.N.C. § 2501(D). In this Court’s view, the agreement consenting to jurisdiction is an added precaution to ensure there are no protracted jurisdictional challenges such as has arisen here.
RPIs have asked this Court to make a specific finding that no one should be allowed to deny the Navajo Nation’s regulatory and adjudicatory jurisdiction on the basis of a violation of our laws. Essentially, RPIs are asking this Court to sit in equity over the jurisdiction question by applying estoppel. See Tafoya v. Navajo *185 Nation Bar Association, 6 Nav. R. 141, 142 (Nav.Sup.Ct.1989). Estoppel is a concept long available in the Navajo Nation courts in cases where a party’s claims of right are barred by the claimant’s own previous actions. Nez v. Peabody Western Coal Co., Inc., 7 Nav. R. 416, 2 Am. Tribal Law 468 (Nav.Sup.Ct.1999). It is within this Court’s power to sit in equity, see Duncan v. Shiprock District Court, 8 Nav. R. 581, 590, 5 Am. Tribal Law 458 (Nav.Sup.Ct.2004) citing Benally v. John, 4 Nav. R. 39, 44 (Nav.Ct.App.1983), however jurisdiction is not a “remedy” to be fashioned in equity or otherwise. This Court will merely state an obvious tenet of governance: no person or entity may deny the Navajo Nation’s regulatory and adjudicatory jurisdiction on the basis of a violation of our laws.
[[Image here]]
Petitioners next argue that the collision, having taken place on U.S. Highway 160, requires application of the Montana test. Proposing that “the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe” on non-fee land, Montana v. United States, 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) and certain rights-of-ways that are “the equivalent of non-fee land,” Strate v. A-1 Contractors, 520 U.S. 438. 454, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), the U.S. Supreme Court stated that the restriction is “subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe’s political integrity, economic security, health, or welfare.” Strate, at 446, 117 S.Ct. 1404.
Assuming for purposes of this analysis that U.S. Highway 160 is the type of right-of-way that requires a Montana analysis, see Strate, at 455-456, 117 S.Ct. 1404 (holding tribal court jurisdiction over accident on state right-of-way requires fulfillment of Montana test), there is a “consensual relationship” in this case: Petitioners were personally present to conduct tour services on the Navajo Nation. Their direct presence on the Navajo Nation and frequency and extent of their activity is supportive of a finding that Petitioners established a consensual relationship with the Navajo Nation sufficient to both support an exception to Montana’s general proposition and be taken as implied consent within the language of the Navajo Nation Long-Arm Statute.
We have stated that the Montana, test is only relevant within the Navajo Nation on non-Indian owned fee land. See Allstate Indemnity Co. v. Blackgoat, 8 Nav. R. 660, 666, n. 2, 6 Am. Tribal Law 637 (Nav.Sup.Ct.2005). We have held that the test is not applicable regarding an accident on a dirt road on trust land policed exclusively by Navajo Nation law enforcement. Ford, supra at 658 citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). While we have found consensual relationship pursuant to Montana in this case, we clarify that U.S. Highway 160 is not like the highway in Strate in several key ways, including our regulatory right. U.S. Highway 160 is within the exclusive regulatory control of the Navajo Nation and is within our territorial jurisdiction as defined by Navajo Nation and U.S. statutes.
Pursuant to 7 N.N.C. § 254(A), the territorial jurisdiction of the Navajo Nation “shall extend to Navajo Indian Country, defined as all land within the exterior boundaries of the Navajo Indian Reservation or of the Eastern Navajo Agency, all land within the limits of dependent Navajo Indian communities, all Navajo Indian allotments, all land owned in fee by the *186 Navajo Nation, and all other land held in trust for, owned in fee by, or leased by the United States to the Navajo Nation or any Band of Navajo Indians.” “Indian Country” is defined at 18 U.S.C. § 1151 as “all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation.” This definition continues to be generally relied upon to demarcate state, federal, and tribal jurisdiction over both criminal and civil matters, see DeCoteau v. District County Court for Tenth Judicial Dist., 420 U.S. 425, 427, n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).
In excepting certain rights-of-ways from the Indian Country definition, the U.S. Supreme Court in Strate relied on a one-of and limited-use exception at 18 U.S.C. § 1154 and 1156 concerning the application of state liquor laws. The Strate Court stated:
For contextual treatment of rights-of-way over Indian land, compare 18 U.S.C. § 1151 (defining “Indian country” in criminal law chapter generally to include “rights-of-way running through [a] reservation”) with §§ 1154(c) and 1156 (term “Indian country,” as used in sections on dispensation and possession of intoxicants, “does not include ,.. rights-of-way through Indian reservations”).
Strate, supra at 455, n. 9, 117 S.Ct. 1404.
It is this Court’s view that the U.S. Supreme Court, by taking the above Indian Country definition out of context, distorts federal governmental policy and ignores the reality of Indian Nation regulatory and jurisprudential authority, particularly on the Navajo Nation.
The Navajo Nation consists of over 17 million largely contiguous acres, traversed by 10,000 miles of public roads—some of which are state and county highways, some BIA-maintained federal roads, and some Navajo-maintained roads—over which the Navajo Nation has retained exclusive regulatory and adjudicatory authority by state acknowledgement of tribal sovereignty. Nearly all of the land is tribal or trust land. Unlike the highway in Strate, tribal law is enforced in all reservation areas including rights-of-ways unless a mutual aid agreement exists in which the Navajo Nation has specifically allowed state law to be applied. Much of the Navajo Nation, including many parts of the state and federal highway systems within it that are hundreds of miles long is distant from any non-Navajo town or city and not served in any way by state law enforcement, regardless of the road’s state or federal designation.[7] Navajo Nation Courts have jurisdiction to the full extent of 7 N.N.C. § 254(A). In this case, it was brought out at oral argument that Navajo Nation police secured the scene and investigated the collision.
Substantial portions of the Navajo Nation sprawls across northern Arizona and New Mexico, and both states approach the Navajo Nation on a government-to-government basis, respecting Navajo Nation regulatory control on all Navajo Nation highways, including U.S. Highway 160. Both states will neither patrol nor apply state law on our reservation lands or highways unless they have been duly deputized as *187 Navajo Nation peace officers, received training in Navajo laws, and a mutual aid agreement exists in which the Navajo Nation has consented to state law enforcement presence. See NMSA 1978, § 29-1-1(D) (2005) (affirming the sovereign status of an Indian nation under the laws of the United States) and see State of New Mexico v. Harrison, No. 31,244, p.l (New Mexico June 8, 2010) (holding that the authority of state officers to enter Indian Country in hot pursuit of a traffic violation must “not infringe on tribal sovereignty by circumventing or contravening a governing tribal procedure.”); and see May 9, 2003 Statement of Policy, signed by New Mexico Governor Bill Richardson and Navajo Nation President Joe Shirley, Jr. (affirming New Mexico’s respect for Navajo Nation sovereignty and the government-to-government relationship).
We said in Ford that Navajo Nation police officers perform patrol and police duties across 26,110 square miles of the Nation and are severely understaffed and underpaid, serving a reservation population of 165,614 with a police officer to population ratio is 0.8:1,000, compared with the recommended United States average ratio of 2.5:1,000. Ford, supra at 660-61. The patrol work in the largely rural high desert is lonely, difficult and thankless. Id. Given the difficulties, the Navajo Nation government has asserted the necessity and ability of the government to enter cooperative agreements with federal and state law enforcement agencies for purposes of mutual assistance pursuant to 17 N.N.C. § 102. Our right whether to enter agreements or withhold consent is fully acknowledged by the state and federal governments with which the Navajo Nation has dealings. See also A.R.S § 13-3872 (permitting mutual aid agreements for peace officers acting outside their agency). We take judicial notice that nonmembers may be stopped on U.S. Highway 160 by Navajo Nation Police or duly-deputized Arizona Department of Public Safety officers, who issue civil tickets to non-members for appearance in both Navajo Nation and Arizona Justice Courts[8]. The U.S. Supreme Court has proposed that the “effect” of a land transfer on Indian Nation regulatory control is dispos-itive. See South Dakota v. Bourland, 508 U.S. 679, 692, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). The grant of a right-of-way on U.S. Highway 160 had no effect on Navajo Nation regulatory control.
RPI argues that another difference between U.S. Highway 160 and the highway in Strate is the Congressional intent behind the construction and subsequent federal grant of rights-of-way to each. The right-of-way on U.S. Highway 160 was intended solely to benefit the Navajo Nation and further the purposes of the Navajo Treaty. See P.L. 474, Chapter 92, April 19, 1950. This differs from Strate, where the highway was intended for general public access to a lake maintained by the Federal Corp. of Engineers. In addition, the Strate highway was short (6.59 miles) in length, while U.S. Highway 160, stretching from the eastern to western external boundaries of the Navajo Nation, is 197.5 miles long, connecting numerous Navajo communities, with rights-of-way granted to two states, neither of whom have any regulatory or adjudicatory authority over the highway without consent of the Navajo Nation.
We find that under the proposition in Strate, U.S. Highway 160 is not “equivalent to non-Indian alienated land for non *188 member governance purposes.” U.S. Highway 160 is part of the territory of the Navajo Nation for governance purposes over reservation matters as defined by 7 N.N.C. § 254(A) and 18 U.C.S. § 1151 and Montanar-Strate is inapplicable.
[[Image here]]
There is no question that the events giving rise to this claim affected the health, safety and welfare of the Navajo Nation as well as members of the Navajo Nation, satisfying the Long-Arm Statute. The fatalities in this case were a Navajo father and fetus. We take judicial notice that the child, even the unborn child, occupies a space in Navajo culture that can best be described as holy or sacred, although neither of these words convey the child’s status accurately. The child is awqq t’áá’ndq4’hin4, alive at conception, and develops perfectly in the care of the mother. The umbilical cord, ííná bita’ nanit’V, is the life line between the mother and unborn child. The mother, and now the surviving grandmother and aunts (RPIs) have the maternal role of Iíná Yqsdá hi, which encompasses bearing, raising and teaching a child, as established by White Shell Woman in our journey narratives. See Riggs v. Estate of Tom, Attakai 7 Am. Tribal Law 534, 536 (Navajo June 13, 2007). It is in the interest of the Navajo Nation government that family members may bring action concerning their children in a Navajo Nation court that fully comprehends how such concerns should be treated on the basis of k’é.
The Navajo Nation has other significant interests in this negligence action. As Congress recently found in the Tribal Law and Order Act of 2010, the complicated jurisdictional scheme that now exists in Indian country has a significant negative impact on the ability to provide public safety to Indian communities and has been increasingly exploited by criminals.[9] The need to provide public safety to those living in, visiting, and traveling through the Navajo Nation is no less exploited in the present jurisdictional scheme, as can be seen by Petitioners unpermitted tour activities in this case. Unregulated tour buses can be a public safety menace while law enforcement presence is limited. Suits pressed in our courts concerning alleged negligent operation of such vehicles, whether by the Navajo Nation directly or otherwise, is an effective method for ensuring compliance with our laws.
Jurisdictional challenges such as this require high costs and commitment of resources. By and large, the questions are exploited by corporations to the detriment of our tribal courts and tribal plaintiffs. Addressing all arguments raised in this and similar jurisdictional challenges by the parties, real parties in interest, and amicus has required an uncommon investment of time and resources by this Court. We can only guess at the difficulties experienced by smaller tribal jurisdictions which lack the resources of the Navajo Nation.
Much has been made by Petitioners and Amicus in their briefs about the characterization by some federal courts of tribal government status as “landowners.” *189 While the United States Supreme Court in its opinion in Montana did not use the term “landowner” in connection with the tribal adjudicative right, Amicus Mountain States Legal Foundation relies on the Ninth Circuit’s decision in Montana v. U.S., in arguing that the Navajo Nation is merely a landowner who may make conditions for conduct on tribal land but has “insufficient retained sovereignty” to enforce those conditions against non-members. Response of Amicus, p.10 citing 604 F.2d 1162, 1169 (9th Cir.1979).[10] Amicus argues that “the power of the Navajo Nation” to regulate, if it exists, ... does not extend to the adjudication of [those] violations. Id., p.18.
The use of the term “landowner” by some federal courts in regard to tribal governments denies the true extent of our governmental role over reservation affairs. It further encourages the dangerous logic put forward by Amicus in this case that ignores history, reality, and express federal Indian policy that has been in effect since 1975 with the enactment of the Indian Self-Determination Act.
When the U.S. Constitution was ratified, Indian Nations were in the process of being discovered. Under the Indian Self-Determination Act, Indian Nations take their place fully in the network of governmental systems of the United States. Enactment of the Indian Self-Determination Act, P.L. 93-638, (January 4, 1975) was a significant milestone in recognizing the government-to-government relationship between the United States and sovereign tribal nations. In addition, P.L. 93-638 has given tribes the opportunity and responsibility to establish their own governments and assume functions previously performed directly or indirectly under the federal trust relationship through contracts with the Bureau of Indian Affairs (BIA). A substantial portion of the operations of Navajo Nation law enforcement, this Court, and the eleven Navajo Nation trial courts are funded and performed pursuant to P.L. 93-638 contracts. Fundamental features of these contracts are the reliance of the Federal Government on tribal governments to perform governmental functions previously under that government’s responsibility.[11] In addition, the governmental functions are performed according to tribal laws whose development is funded by the Federal Government.
The concept of land ownership from which the term “landowner” is being applied to Indian Nations was wholly foreign to the Navajo People. Our ancestors understood that the Navajo Treaty terms provided that we would be free to handle all reservation affairs not expressly excepted in the document, and handle them according to our own laws. It is universally understood in the Navajo world that the future of the Navajo Nation was secured for posterity by our valiant ancestors (Ni-hizázíni')- This sacrifice is poignantly stated in the phrase Naayéé’ yee ak’eh- *190 deesdli/igo Hdzhqqjii yee ak’idiym (by defending the Navajo Way of Life, our ancestors restored peace and harmony with the United States). Ford, supra at 656. To the Navajo, the Treaty is the primary organic law in reservation matters much like we view the U.S. Constitution collectively as American citizens.
Throughout the Montana-Strate line of eases, there runs the implicit notion that tribes and tribal laws are, somehow, foreign, and consequently hostile to nonmembers. At one point, the federal government was also considered hostile to the states. The U.S. Supreme Court stated “The federal government is neither foreign to the state governments, nor is it hostile to them. It proceeds from the same people ... ” Worcester v. Georgia, 31 U.S. 515, 571, 6 Pet. 515, 8 L.Ed. 483 (1832).
In this day and age, the Navajo People are proud American citizens, having served in several wars, swearing oaths of loyalty to the United States in our schools, and leaving the reservation to participate in state and federal governments or take other important roles in mainstream society. Official public events on the Navajo Nation are opened and closed by a veteran color guard of Navajo Nation members, sometimes including the famed Code Talkers who served in World War II. Our laws, although indigenous and extra-Constitutional, are American domestic laws that will endure for future generations through the Federal policy of Indian self-determination. Our laws reflect our indigenous cultures and practices. They are vital to the survival of our culture, which is not only a Navajo heritage, but a heritage of the American people.
While our laws are not covered under the Constitution, they are American laws of a unique American sovereign governing system. Fully cognizant of the complexity of the legal environment and rising to the burdens of responsible government, the Navajo Nation has safeguards in place to afford due process to all individuals subject to our jurisdiction.
The Navajo Nation, while lacking a Constitution, has written organic laws which “set the boundaries for permissible governmental action by the legislative, executive, and judicial branches of the Navajo Nation.”[12] Doctrines of checks and balances, separation of powers, accountability to the People, and service of the anti-corruption principle formed the premise for “The Title II Amendments of 1989” (Title II Amendments) enacted by Navajo Nation Council Resolution CD-68-89 on December 15, 1989,[13] which established our three-branch government. Principles of due process, equal protection, the right to counsel in criminal cases, rights of assembly and petition, the right to bear arms, freedom of religion and other rights closely tracking the United States Bill of Rights are guaranteed by the Navajo Nation Bill of Rights (1986). Judicial fairness and independence and access to the courts are guaranteed by the Judicial Reform Act of 1985. The above laws, in addition to substantive rights found in the Navajo Treaty and broad principles of fundamental fairness in our tribal Fundamental Laws, “set the boundaries for permissible governmental action by the legislative, executive, and judicial branches of the Navajo Nation,” and are collectively our “fundamental, organic laws.”[14] We interpret our laws according to our heightened standards of fundamental fairness, which must be deferred to by the federal courts. See Hinshaw v. Mahler, 42 F.3d 1178, 1180 (9th *191 Cir.1994) (“The Tribal Court’s interpretation of tribal law is binding on this court.”); and see Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 16-17, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (“Adjudication ... by any nontribal court ... infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law.”).
Thousands of non-Navajos play important roles in Navajo government and society. A majority of the 400-strong membership of the Navajo Nation Bar Association are non-Navajos and also state-licensed attorneys. Non-members sene on our juries, may act as tribal court staff attorneys and commissioners, may be appointed as hearing officers, and may hold important governmental positions. As an indication of the even-handedness of Navajo Nation courts, over 20% of non-indigent Navajo Nation court cases have involved non-Navajos, with non-members winning 47.4% of such cases.[15] We further note that non-Navajos practicing in our courts argue Navajo fundamental laws learned through our published opinions, our statutes, scholarly writings, and contact with elders.
Our courts, which are American courts, strive to be fair to all. Jurisdiction of our courts is the civil authority of one governmental system among a diverse many in the United States, readily understood by those engaging with the Navajo People within our borders.
VI
Based on the above, the Court DENIES the request for a writ of prohibition.

. See 2005-2006 Comprehensive Economic Development Strategy of the Navajo Nation at 46.

. See Strate v. A-1 Contractors, 520 U.S. 438, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (“As to nonrnembers ... a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction.”).

. Id.

. The American Southwest at http://www. americansouthwest.net/utah/monument_ valley/; USA Travel and Tourism Guide at http: //www.usatourist.com/english/ destinations/utah/monumentvalley/monument valley-main.html.

. USA Travel and Tourism Guide, supra.

. http://www.navajonationparks.org/htm/ monumentvalley.htm

. Brief of the National American Indian Court Judges Association, the Navajo Nation, and the Northwest Intertribal Court System as Amicus Curiae in Support of Respondents, p. 15 in Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. 316, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008) citing the 2003 Navajo Nation Long Range Comprehensive Transportation Plan at H-l and III-l, available at www.navajodot.org/cms/kunde/rts/ na-vajodotorg/docs/ 223131733-08-22-2007-08-46-15.pdf

. There is an Arizona Justice Court in Kayen-ta which has concurrent jurisdiction by consent of the Navajo Nation government.

. July 29, 2010 Tribal Law and Order Act, HR1325, SA 4391, Division B, Section 2 (Findings) in relevant part as follows:
(3) less than 3,000 tribal and Federal law enforcement officers patrol more than 56,000,000 acres of Indian country, which reflects less than 1/2 of the law enforcement presence in comparable rural communities nationwide;
(4) the complicated jurisdictional scheme that exists in Indian country—
(A) has a significant negative impact on the ability to provide public safety to Indian communities;
(B) has been increasingly exploited by criminals[.]

. The Ninth Circuit in Montana had likened the Crow Tribe to a private owner of land who “may exclude the public from hunting and fishing thereon; his admission of the public, however, does not clothe him with all the raiment of sovereignty.”

. On September 23, 2004, President George W. Bush issued Executive Memorandum Gov-emment-to-Govemment Relationship with Tribal Governments recommitting the federal government to work with federally-recognized Native American tribal governments on a gov-emment-to-government basis and strongly supporting and respecting tribal sovereignty and self-determination. On November 5, 2009, President Barack Obama issued a Memorandum on Tribal Consultation committing to regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications, and strengthening the government-to-govemment relationship between the United States and Indian tribes.

. Morgan v. Shirley, No. SC-CV-02-10 slip op. at 16 (Nav.Sup.Ct. May 28, 2010).

. Id.

. Bennett v. Navajo Board of Election Supervisors, 6 Nav. R. 319, 323 (Nav.Sup.Ct.1990).

. Brief of the National American Indian Court Judges Association et al, supra, n. 7. pp. 16-17, citing a study of Navajo appellate court decisions between January 1969 and December 2004 (the “Navajo Court Study"), Berger, 37 Ariz. St. L.J. at 1068, 1075.