OPINION

This case concerns an appeal of a Shi-prock District Court Order Granting In-junctive Relief issued on February 7, 2011. In its order, the district court enjoined Appellants “from interfering with or preventing the [Navajo] Nation’s access to, and construction of, the project known as the Shiproek Home for Women and Children located on the Navajo Nation in Shi-prock, New Mexico” and further enjoined Appellants “from acts that include, but are not limited to, physically blocking the Nation’s access to the Project, and contact to third parties intended to dissuade, or threaten against, participation in the completion of the Project.” We affirm the district court’s decision.
BACKGROUND
Appellant Home for Women and Children (HWC) is a non-profit incorporated in New Mexico[1] that for several years pursued the development of a shelter facility for victims of domestic violence (Shelter Project) in Shiproek on the Navajo Nation (Nation) with the intent that it would also operate that facility. On October 27, 2003, HWC hired Appellant RJN, a Colorado-based business owned by Appellant Robert Nelson (collectively RJN) for “construction management services,” specifically for pursuing funding, project planning, contract administration, coordination of meetings (between owner, architect and subcontractors), construction and supply, code compliance, and on-site project management of the Shelter Project. R. at 26, Exh. B. Subsequently, substantial grant funding for the Shelter Project was obtained, first approximately $4 million federal NAHAS-DA[2] grants and later in 2006, a $496,000 New Mexico Indian Affairs Department (NMIAD) grant to fund the Shelter Project, the latter of which required spending to be administered by the Nation and for the Nation to ultimately own the completed facility. At some point, general plans and an architect’s design for a 5-building permanent facility were obtained and submitted by HWC as a description of work in HWC’s application for a business site lease (BSL) on which the Shelter Project would be built and operated.
On July 6, 2007, HWC’s BSL was approved by the Bureau of Indian Affairs and the Navajo Nation Economic Development Committee (EDC). The BSL was for a 75 year term, renewable for 24 years, for 2 acres in Shiproek and required HWC *269 to develop (i.e. build on-site), use and operate a shelter facility for abused domestic violence victims and children. R. at 12, Exh. A. Upon obtaining the BSL, HWC began operating a temporary shelter out of trailers on the leasehold while the Shelter Project was being constructed in a different part of the leasehold.
On August 30, 2007, RJN entered a “construction contract” with the Nation for “total on-site management functions” at a cost of $496,000 to end “when project is completed.” R. at 12, Exh. G-l. The Navajo Division of Community Development stated in the contract that “[tjhe original contract is ‘Open Ended’ and/or untO the project is completed. The intent is [sic ] to keep this open ended is because there were more funds coming from the State of New Mexico Indian Affairs Department for this particular project.” R. at 12, Exh. G-2. Article 9 of this construction contract provides “The product(s) and title of the Contractor’s work and services under this Contract shall be and will remain the property of the Nation.” R. at 12, Exh. G-l. Article 13 of this construction contract provides that disputes “will be settled administratively under the laws of the Navajo Nation.” Id. Article 14 provides that the Nation can terminate the contract “at any time if the Contractor’s work or services are not satisfactory.” Id. In May 2008, the expected additional grant funds from NMIAD were received. Accordingly, on June 24, 2008 the Nation amended the August 30, 2007 contract with RJN “to increase the contract sum amount by $99,000.” R. at 12, Exh. G-2. All other terms and conditions of the August 30, 2007 contract remained unchanged and in foree.
Over the years HWC’s BSL underwent substantial changes. On September 30, 2009, the HWC Board voted to amend the BSL in order to pave the way for HWC to enter into an amended BSL that would comply with the public facility ownership requirements of the NMIAD grant funding. R. at 12, Exh H-l. Following adoption of the Navajo Nation Business Site Leasing Regulations of 2005 (BSLR) in keeping with developments in federal law, HWC’s BSL was amended on March 24, 2010 to state that it is now covered by the BSLR, and further modified to remove federal approval or supervision. R. at 12, Exh. H-2. (For details of these developments, see pp. 271-72, infra). On May 7, 2010, the EDC amended Article E of the BSL shifting the burden to build the facility to the Nation and providing that the facility would become the lessor’s property “upon completion of development of the buildings.” R. at 12, Exh. H-3. The EDC also amended Article F to require the Nation to complete the construction “in accordance with the Contract administered by Lessor.” Id.
As of November, 2010, three years after the approval of the BSL, the Shelter Project was still not completed. Appellants claimed 20% remained to be complete while Appellee claimed a substantially higher percentage of incompletion. During 2010, relations between the Nation and Appellants greatly deteriorated. With the Shelter Project still incomplete, the NMIAD funds had been depleted and NA-HASDA funds were no longer accessible for use by Appellants due to issues with code compliance.[3] When in February 2010, the Nation obtained an additional $1,145 million in new NMIAD grants for the Shelter Project, the Navajo Nation Department of Justice successfully opposed a Navajo Nation Council resolution on November 4, 2010 that would have *270 waived procurement laws and approved a third Navajo Nation contract with RJN. R. at 12, Exhs. O, P, & Q. As the Nation proceeded to take steps to bid out construction of the final phase of the Shelter Project, on November 9, 2010, Appellant’s counsel wrote letters to prospective bidders warning them of existing contractual issues between the Nation and RJN that would cloud a future construction contract. On November 12, 2010, RJN sent a protest letter to the Navajo Nation Controller with copies to the Division of Finance and Navajo Nation President; the Controller refused acceptance of the letter.
On November 16, 2010, after padlocks were placed by RJN or HWC on the fence enclosing the Shelter Project, purportedly to secure the Shelter Project worksite (worksite), the Nation filed a complaint and motion for preliminary injunction in the Shiprock District Court to enjoin HWC and RJN from interfering with the construction of the Shelter Project whether by locking the gates against the Nation or by contacting prospective bidders.
RJN offered as its defense that it owned the plans for the facility as a “design-build” per its October 27, 2003 contract with HWC and that its August 30, 2007 contract with the Nation could only expire upon the Shelter Project’s completion. Appellee requested an expedited adjudicative process on the basis that several time-sensitive grants from NMIAD would expire if the Shelter Project were not completed by June, 2011. The parties’ stipulated that the final trial would be consolidated with the motion for a preliminary injunction and further stipulated that the district court could make a decision on the basis of the submitted documents. The district court then issued a permanent injunction, finding that the Nation is the owner of the project and leasehold, that HWC lacked sufficient possessory interest in the property to lock out the Nation, and that RJN’s contract-based claims were barred both by sovereign immunity and by a clause in RJN’s contract with the Nation that required disputes to be addressed administratively. This timely appeal ensues. The parties have submitted briefs. The parties and amicus Office of the Legislative Counsel have also submitted supplemental briefs on ownership and leases on Navajo trust lands. Oral argument was held on November 14, 2011 at Yale Law School in New Haven, Connecticut.
ISSUES
The issues before this Court are (a) whether a permanent injunction was properly issued; and (b) whether Appellants’ defenses were properly barred.
STANDARD OF REVIEW
We review the issues for abuse of discretion by the district court. While judges have discretion, that discretion is limited by legal principles and must be exercised in conformity with the spirit of the law and adopted rules, to serve the ends of justice. See Sheppard v. Dayzie, 8 Nav. R. 430, 434, 5 Am. Tribal Law 374 (Nav.Sup.Ct.2004). As a general principle, we will give considerable deference to the lower court’s exercise of discretion. Higdon v. Nelson, 7 Nav. R. 158, 159 (Nav.Sup.Ct.1995) (internal citations omitted).
We review the underlying factual findings for clear error and the legal conclusions de novo. An erroneous application of law is an abuse of discretion. Navajo Housing Authority v. Bluffview Resident Management Corp., 8 Nav. R. 402, 412, 4 Am. Tribal Law 700 (Nav.Sup.Ct.2003) (internal citations omitted).
*271 JURISDICTION
Jurisdiction over Navajo Nation lands and matters arising on the Nation is well-settled both as an inherent right and as conferred under Article II of the Treaty of 1868. See EXC, Inc. v. Kayenta Dist. Court., 9 Am. Tribal Law 176, 179-80 (Nav.Sup.Ct.2010). Additionally, jurisdiction is proper over non-member Appellants in this case pursuant to the Navajo Nation Long-Arm Statute at 7 N.N.C. § 253(a) due to their extensive non-profit and for-profit business dealings and written and implied consent to jurisdiction through HWC’s BSL and RJN’s contracts with the Nation.
DISCUSSION
The district court’s injunction addresses roles and duties in HWC’s BSL. The portion enjoining interference with the physical access of the Nation to the leasehold, addresses the Nation’s dual roles both as Lessor and as the entity charged with building the facility at Article E of HWC’s May 7, 2010 amended BSL. The remaining portion enjoining interference with the Nation’s dealings with third party vendors or interference of any other kind, addresses the Nation’s May 7, 2010 BSL-based duty to build. Claiming possessory rights under its BSL over the developing project until its completion and further claiming contract-based proprietary rights over the facility design and over the project’s completion and further claiming that the Nation has given it no choice but to use self-help measures, Appellants state that their ability to secure the worksite with padlocks and that their communications with third parties, as a matter of fairness, should not be enjoined.
A. Best Interest of the Nation. We first note that long-term business leaseholds on Indian trust land were initially the creation of federal statutory law. Navajo trust lands, no different from other Indian tribal land held in trust or restricted status by the federal government, are not alienable, but may be leased to Indians or non-Indians for a variety of specific purposes under applicable law. These laws include the Indian Long-Term Leasing Act of 1955 (25 U.S.C. § 415) which require the Secretary of the Interior (Secretary) to approve and administer such leases for the beneficial ownership of tribes. However, on December 27, 2000, Congress passed the Navajo Nation Trust Land Leasing Act of 2000, P.L. 106-568, title XII, codified at 25 U.S.C. § 415(e), authorizing the Nation to develop regulations under tribal law and issue leases without the approval of the Secretary, provided such regulations are consistent with the Secretary’s regulations. The tribal regulations need not be identical to the Secretary’s but may reflect the Nation’s special needs and circumstances.[4]
On January 3, 2007, the EDC adopted the “Navajo Nation Business Site Leasing Regulations of 2005” (BSLR) (Resolution No. EDCJA-02-07)[5] which effectuated the transfer of the Secretary’s approval and administrative authority over business site leases to the Nation. The regulation of such leaseholds is presently governed by the BSLR pursuant to Navajo Nation law, *272 reflecting the Nation’s unique circumstances.
 The Treaty of 1868 provides that Navajo lands “be set apart for the continued use and occupation for the Navajo tribe,” which means the Nation as a collective entity. Gishie v. Morris, 7 Am. Tribal Law 624, 625-26 (Nav.Sup.Ct.2008). Unlike commercial leases on private (fee simple) lands, the freedom of both the Navajo Nation lessor and individual business site lease holders on Navajo trust lands is tempered by the responsibility to manage and hold such leases for the collective good. We have stated that “[a] land use decision by the people through their governments is the balance struck between the individual land user and the needs and desires of the community.” Navajo Nation v. Arviso, 8 Nav. R. 697, 703, 6 Am. Tribal Law 675 (Nav.Sup.Ct.2005). The Navajo Nation Council recognized that Diñé bi been-ahaz’áanii teaches that the rights and freedoms of the individual are not the only considerations. Resolution No. CN-69-02, Exhibit A § 2(A), (B) (November 13, 2002). The rights and freedoms of the people as a whole must also be recognized. Arviso, supra at 704, 6 Am. Tribal Law 675 citing Tome v. The Navajo Nation, 4 Nav. R. 159, 161 (Nav.Ct.App.1983). As a result, individuals “may not take such actions as will ‘jeopardize the interests of the Navajo Nation in the land.’ ” Id. citing Johnson v. Dixon, 4 Nav. R. 108, 112 (Nav.Ct.App.1983). It is clear from the language of Arviso that “Navajo Nation” means the Diñé as a whole. We note that the BSLR reflects the responsibility of government and individuals to the people by requiring that lease approvals be subject to a “best interest of the Navajo Nation” balancing of interests and that a lessee’s use, occupancy and possessory rights are limited to “specific purpose” conditions set forth in the lessee’s BSL which is written into the BSL after a determination that the purpose is in the people’s interest. See BSLR § 103(A)(3) and (16), 106, and 305.
In light of our customary and regulatory laws, it is clear that government and individuals’ actions concerning business leaseholds shall be assessed in light of the best interests of the Diñé people. In this case where an injunction implicates such a leasehold, this is the standard that shall be paramount.
B. Injunction. The judicial issuance of injunctions is an entirely equitable remedy. The concept of equity is one that is fundamental in Navajo justice. There is no more desirable a proceeding in our culture than where disputes are confronted and a solution reached that is often a balance of hardships. The goal is H6-zhó—harmony, beauty and balance. As this case concerns land use, the interests of the people as a collective whole must also figure prominently. Part and parcel of the responsibilities of a Navajo court sitting in equity are yini dilyingo nábiná-haazláago t’áá’altso aheelt’éego baantsá hákeesgo bá hasht’éédoolníü—rendering a decision with fundamental fairness to all.
Nav. R. Civ. P. Rule 65(d) permit a hearing for preliminary injunction to be consolidated with a trial on the merits, in this case, a complaint for permanent injunction. Rule 65(c) sets forth the elements that must be found by a district court in issuing a preliminary injunction, namely:
(1) That the moving party has or is claiming a protectable right or interest and has a high likelihood of success on the merits;
(2) That irreparable injury, loss, or damage to that right or interest is likely to occur unless the preliminary injunction is issued;
*273 (3) That the threatened injury, loss or damage is substantial in nature or character; and
(4) That the moving party does not have an adequate remedy at law'.
Nav. R. Civ. P. Rule 65(c).
We note that when the preliminary and permanent injunction actions are consolidated into a trial on the merits, as in this case, the success or failure of the moving party will be a certainty and therefore, the “high likelihood of success on the merits” pursuant to Rule 65(c)(1) need not be separately found. The remaining elements must be met. ‘
In this case, the equity issue was framed by the district court in terms of competing ownership rights. The court identified as protectable interests the Nation’s exclusive possession of the leasehold by virtue of its ownership of the lease and facility under construction as a matter of law. It further determined that the potential loss of grant funds is the substantial injury for which there is no adequate remedy at law.
Firstly, the notion of possession based on ownership of tribal land has puzzled this Court. We have approached the issue as one unique to tribal lands, where title and beneficial ownership is split between the federal government and the Navajo people respectively, see, e.g., Kayenta Township Commission v. Ward et al., 9 Am. Tribal Law 484, 486-87 (Nav.Sup.Ct.2011), and where the collective ownership of the land by the tribe through its central and local governments and townships may carry privileges undefined in the normal definitions of real estate outside tribal reservations. We have stated that “[i]n Indian trust land matters on the Navajo Nation where several parties are required under federal and tribal law to sign a valid and binding lease, title, ownership, and actual possession do not reside in the same party and even the lease approval authority may be divided between different authorities.” Id. at 486-87. Therefore, we have not been quick to dismiss the notion of ownership-based possessory rights put forward by the district court, and have asked for supplemental briefing on the issue from the parties and amicus Legislative Counsel. Legislative Counsel submitted the full text of the BSLR. Appellants argue that they own the facility under construction; therefore, they possess the worksite portion of the leasehold, or possess the entire leasehold due to silence on the issue in the amended BSL. Citing Arviso, supra, Appellee argues that tribal business site leases, different from commercial leases of private (fee) lands, are mere tenancies where the lessee only has use rights, and the lessor acting on behalf of the people has the right of possession. However, nowhere in Arviso did this Court state that business site leaseholds are mere tenancies, nor that the right of use under a lease is conferred without the right of possession.
The provisions of the BSLR and the terms of HWC’s amended BSL are at the heart of the concept of possession in this case. The possessory interest is legally defined as “the exclusive right to exert control over specific land by virtue of an interest created in the property that need not be accompanied by title.” Kayenta Township, at 487. The possessory right exists when there is “a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control.” Id. The BSLR provides that the Nation as the “managing entity” may only enter the leasehold at reasonable times for purposes of enforcing the lease. BSLR § 501. It is the leaseholder w'ho has the “right to possess” and the “right to use and occupy” the leasehold exclusively for a specific time so long as the leaseholder *274 pursues the “specific purpose” set forth in their BSL. See BSLR § 103(A)(16) and (18). In other words, the right of possession belongs to the leaseholder and is strictly aligned with the specific purpose for which the BSL was approved. As a matter of law, the leaseholder possesses the leasehold to the extent of its approved use.
In this case, the specific purpose for which HWC’s leasehold was approved (develop, use and occupy a shelter facility) changed drastically over time as the BSL was amended. Following the May 7, 2010 amendment, the facility’s development responsibility shifted to the Nation. We find that when this occurred, HWC lost the development basis for possession by operation of law. What remains to HWC are the “use and operate” bases for possession over the non-worksite portions of the leasehold, namely, the land on which HWC was operating shelters out of temporary trailers. Additionally, HWC’s claim of ownership of the facility under construction is puzzling, since it was built using public funds disbursed by the Navajo Nation.[6] The claim otherwise has no relevance because, again, the right to occupy and possess the worksite itself passed to the Nation, as a matter of law, when the Nation was designated to develop the facility under the amended BSL. Appellant RJN, as HWC’s contractor, could have no greater rights than HWC. It is on this basis, and not ownership, that we uphold the district court’s finding of the Nation’s exclusive possessory right as a protectable interest.
The district court also strongly suggested that the Nation’s need to protect its grant funding and construct the facility are protectable interests. We agree on the basis that these matters involve the rights and freedoms of the people. Pursuant to the BSLR, the government as the managing entity must ensure that the people’s resources are maximized. They must protect the public treasury, including by ensuring that funding deadlines and conditions are met. Additionally, both the managing entity and lessee are accountable to the people and must prevent waste by all means whether through their actions or inaction.
Injunctions can be issued to the government on behalf of the people when the conduct in question threatens public funds and delays completion of a needed public facility, as in this case. As the purpose of the injunction was to safeguard grant funding by preventing Appellants from further conduct that would interfere with the Nation’s ability to develop the facility under the BSL within the grant funding deadline, we agree with the district court that Nav. R. Civ. P. Rule 65(c)(1) is met.
At this point, it must be acknowledged that RJN’s defenses were not permitted by the district court for reasons of wrong forum and sovereign immunity. Firstly, the district court declined to hear RJN’s defenses on the basis that they are counter-claims that should be addressed “administratively,” by the terms of RJN’s contract with the Nation. However, it was the Nation, not RJN, that sought an equitable remedy from the Navajo Nation *275 courts. Navajo Nation administrative bodies have their jurisdiction and authority sharply delineated by statute, and no statute presently grants them the equitable authority to grant injunctive relief. In-junctive relief is afforded by the district courts. When such equitable relief is sought in our courts and cannot be obtained from any other forum, we find that defenses shall be liberally allowed that would assist the court in reaching an equitable decision, notwithstanding contractual provisions providing for administrative dispute resolution.
Secondly, the court barred the defenses under sovereign immunity. The Sovereign Immunity Act at 1 N.N.C. §§ 551-555 bars suits against the Nation without its consent. This Court recognizes the right of the Nation to assert the defense of sovereign immunity in suits brought against it. Dennison v. Tucson Gas and Electric Co., 1 Nav. R. 95 (Nav.Ct.App.1974); Halona v. MacDonald, 1 Nav. R. 189 (Nav.Ct.App.1978); Keeswood v. The Navajo Tribe, 2 Nav. R. 46 (Nav.Ct.App.1979). While it is without question that our government cannot be sued except by its expressed consent, see Judy v. White, 8 Nav. R. 510, 532, 5 Am. Tribal Law 418 (Nav.Sup.Ct.2004), however in this case it was the Nation that filed a suit in equity, and Appellants sought to introduce issues in its defense. We have reviewed the record and find that none of the Appellants have filed any claim for monetary damages. We have stated that “the [Sovereign Immunity] Rule rests on the rationale that the taxpayers at large should not be subjected to the cost of a judgment entered as a penalty against a government official which comes as a windfall to the individual litigant.” Loley v. Dept. of Employment and Training, 7 Nav. R. 406, 412, 2 Am. Tribal Law 459 (Nav.Sup.Ct.1999) (citing Campbell v. Eastland, 307 F.2d 478, 491 (5th Cir.1962)). In this case, RJN was merely providing justifications in defense of its actions and claiming no monetary damages, before a court sitting in equity over an injunction matter. The court sitting in such a capacity has neither the need nor authority to determine the merits of a contractual claim, only to grant the equitable relief asked for under many principles grounded in Diñé bi beenaJiaz’áanii, including yini dilyingo nábináhaazláago t’áá’attso aheelt’éego baantsá hákeesgo bá hasht’éédoolníü when the elements of Nav. R. Civ. P. Rule 65(e) are fulfilled. Under the circumstances, Appellants’ defenses should have been permitted to assist the court in determining whether, in balancing the equities, an injunction may be issued in good conscience,
In determining whether or not the district court’s error would require remand or was, in fact, harmless, we address the relevance of Appellants’ defenses to the district court’s decision.
It is Appellants assertion that they had no choice but to resort to self-help by padlocking the worksite and sending off letters to third parties, because the Nation ignored its written protest letter. We find this reason wholly meritless. Like Appel-lee, Appellants had full access to seek an injunction in the Navajo Nation courts.[7] The Nation provides Appellants several avenues and forums by which to seek remedies under the law rather than take the law into their own hands with real potential for public nuisance and injury through blocking property access, and spreading ill-feeling in communications with third parties against their doing business on the Nation, to the great detriment of the Diñé.
*276 Appellants claim that they were unclear about the procedure and what forum in which to pursue their contract-based grievances. If the Appellants are unsure, it is up to them to seek clarity, whereupon it would be the duty of the Nation to provide that clarity. Appellants’ letter to the Controller, characterized by Appellants as a “protest letter” asks for no hearing, nor does any other document on the record that we have reviewed.
Finally, Appellant RJN asserts that even though the contract amounts have been depleted, it is entitled to be paid future amounts not included in the contract budget, until the Shelter Project is complete, because the contract provides that it is “open-ended” for RJN to perform work until completion. However, the open-endedness in the contract clearly pertains to an expected $99,000 in additional NMIAD funds, which, when received, became the basis of a contract modification with RJN after the initial contract funds were depleted. R. at 12, Exh. G-2. All NMIAD funds expected at that time have since been depleted.[8] The Court cannot comprehend how a depleted contract bears on the consideration of equities in this case, even if RJN were offering its future performance gratis. Appellants further assert that RJN owns the facility design plans as a “design-build.” We note that no evidence was offered showing specific provisions for a design-build, nor showing that RUST hired, paid for and supervised the architect directly, nor any other facts that would support a design-build. A bald claim of a “design-build” has no relevance in these proceedings. Therefore, we find harmless error.
Substantial irreparable injury is a pre-requisite to the issuance of injunctive relief pursuant to Rule 65(c)(2) and (3). An irreparable injury is, in equity, “the type of harm which no monetary compensation can cure or put conditions back the way they were.”[9] Díí bitsgq, áhát’ynlgíí ákódzaagoo éí doo béeso bee k’éi hodidoo’ níilda, doo éí hozhbogo haz’qánéidoo dlíílda. The district court considered the potential loss of NMIAD funds, totaling as much as $1,145 million for the Shelter Project as a substantial irreparable injury if the project could not be completed on time. We agree that Rule 65(c)(2) and (3) are met.
Additionally, to be entitled to an injunction, the plaintiff must have no other adequate remedy at law pursuant to Rule 65(c)(4). It is evident to this Court that no adequate remedy at law would replace the loss of as much as $1,145 million in public funds, nor would any remedy provide the public with the needed shelter. We agree that Rule (c)(4), and therefore all elements required under Rule 65(c) for the finding of an injunction, are met.
We close with this observation. In order to serve the best interest of the Nation in developing the Navajo economy and attracting businesses, the business community must have confidence that there exists an administrative process, and that business leaseholders may utilize this process to address their concerns. Navajo law requires that the Nation—in all of its forms—exercise its powers of land admin *277 istration responsibly and in a manner that protects individual rights.[10] See Tuba City v. Sloan, 8 Nav. R. 159, 167, 3 Am. Tribal Law 508 (Nav.Sup.Ct.2001). We have held that due process provides for notice and an opportunity to be heard, Begay v. Navajo Nation,, 6 Nav. R. 20, 24 (Nav.Ct.App.1988). Due process under Navajo traditional and common law requires that the Navajo Nation government “ensure fundamental fairness in all tribal actions.” Atcitty v. District Court for the Judicial of Window Rock, 7 Nav. R. 227, 231 (Nav.Sup.Ct.1996) citing Keeswood v. Navajo Tribe, 2 Nav. R. 46, 50 (Nav.Ct.App.1979).
CONCLUSION
For the foregoing reasons, the Shiprock District Court’s Order Granting Injunc-tive Relief is AFFIRMED.

. At oral argument, Appellants’ counsel was unable to verify whether HWC has ever registered as a foreign corporation with the Navajo Nation Business Regulatory' Department as required by the Nation's Corporation Code. The failure to verify that the Appellants are authorized to conduct business on the Navajo Nation could be a serious concern as to whether any Navajo Nation forum could properly consider Appellants’ claims. In this case, given that the ultimate decision is one of equity and the Appellee has raised no challenge, the Court need not allow this failure to have any practical effect on the appeal. However, the Court does not condone the failure of any individual or entity to comply with the Nation’s laws, including its Corporation Code.

. Native American Housing Assistance and Self Determination Act of 1996.

. The Navajo Housing Authority (NHA) which administered the NAHASDA grant first put on hold then terminated its grant agreement with HWC in 2010.

. See Senate Reports: No. 106-368 accompanying S. 1658 (Committee on Indian Affairs): Congressional Record, Vol. 146 (2000), and H.R. 5528.

. As authorized by its enabling legislation, the Navajo Nation Business Site Leasing Act of 2000, 2 N.N.C. § 724 and 5 N.N.C. § 2301-2306; and the Navajo Nation Local Governance Act codified at Title 26 N.N.C. and enabling legislation of its local governmental units, to promulgate business site leasing regulations for the Nation's business site leasing progi am.

. 25 U.S.C. § 415(e) permits the Navajo Nation to create regulations for leases for "public, religious, educational, recreational or residential purposes.” However, the Navajo Nation has not adopted distinct regulations for nonprofits thus far. Such regulations may well have avoided issues raised in this case. We urge the Executive Branch and the Council to promulgate regulations for nonprofits in order to clarify lessees’ rights and responsibilities in leases for public purposes.

. Provided, of course, that they are duly incorporated in the Navajo Nation. See n. 1.

. It is apparent from the contract documents that the $496,000 contract amount plus the additional $99,000 pursuant to the June 24, 2008 modification were the total foreseen contractor costs for the Shelter Project. The record does not explain why substantial later amounts (totaling $1,145 million) became necessary for completion of the Shelter Project.

. Gerald & Kathleen Hill, The People’s Law Dictionary (1981-2005), http://dictionary.law. com.

. Officials should also show respect for those who seek the government's assistance. In this case, the Controller's action in refusing Appellants’ letter and the general failure of the Navajo Nation to provide guidance to Appellants were not respectful.